## THE ERIE RAILWAY COMPANY v. THE STATE OF NEW JERSEY.

## THE DELAWARE AND LACKAWANNA RAILROAD COMPANY v. THE STATE OF NEW JERSEY.

1. A law for revenue, laying a distinctive tax on the business of foreign corporations habitually doing business in this state, such business consisting of the transportation of goods, *in transitu*, from state to state, and the tax being graduated by the weight of the goods and the number of the passengers carried, is an infringement of the clause of the constitution of the United States giving to congress the regulation of commerce between the several states.
2. Such tax, though in form on the *business* of the companies, is in substance a tax on the commodities, the transportation of which constitutes such business.
3. Whenever the taxation of a commodity would amount to a regulation of commerce within the prohibition of the constitution, so will the taxation of an inseparable incident or necessary concomitant of such commodity.
4. A state cannot tax a foreign corporation on a principle different from that in which she can tax one of her domestic corporations.
5. The power to refuse a recognition of corporate existence does not involve the right to tax a foreign corporation at the arbitrary discretion of the government possessing such power.
6. The act of taxation is a recognition of the legal status of the corporation taxed, and admits that such corporation is clothed with all the rights necessary to defend itself against illegal taxation.

Error to the Supreme Court.

For state of the case and opinion of the Supreme Court, *vide* 1 *Vroom* 473.

The above stated cases were argued together by consent.

For the plaintiffs in error, *I. W. Scudder*, *D. A. Depue*, *J. G. Shipman*, and *B. Eaton*, of New York.

For the defendant in error, *The Attorney General*.

The opinion of the court was delivered by

BEASLEY, CHIEF JUSTICE.   The important question to be decided in this case arises out of the provision of the tenth section of the act of the legislature of this state relating to taxes, passed in the year 1862.

As much of the section as is thus drawn in question, is in the words following, viz.: "That all corporations regularly doing business in this state, and not being corporations of this state, shall be assessed and taxed for and in respect of the business so by them done and transacted in this state, in manner following, that is to say : every such company so doing business shall pay a transit duty of three cents on every passenger, and two cents on every ton of goods, wares, and merchandise or other articles, carried or transported by or for such company on any railroad or canal in this state, for any distance exceeding ten miles, except passengers and freight transported exclusively within this state.   And such transit duty for railroad or canal transportation, shall be paid to the treasurer of this state within the month of January in each year, for the transportation of the previous year; and it shall be the duty of the president or treasurer of every such company to furnish to the treasurer of the state, by or before the third Tuesday of January, annually, under oath or affirmation, a full and true account of the number of passengers, and of the number of tons of goods, wares, and merchandise and other articles, so carried or transported as aforesaid."

It is sufficient for all the purposes of the following discussion to state, generally, that the plaintiffs in error are a corporation created by the laws of New York, and that the business which they habitually do in this state, and which is liable to the tax in dispute, is thus described in the state of the case agreed upon by the parties : "Most of · the goods, wares, merchandise, and passengers, for the transportation of which by the Erie Railway Company, in the state of New Jersey, the said transit duty or tax is charged, have been, by that company and other railroads in connection with

them, carried over the state of New Jersey from states and territories of the United States in the West, to states of the United States in the East, and from states of the United States in the East, over New Jersey, to states and territories of the United States in the West. Some few goods, wares, merchandise, and passengers have been transported from states and territories beyond the limits of the state of New Jersey, which transportation in New Jersey has exceeded ten miles."

From this statement of facts it appears that the plaintiffs are a foreign corporation, habitually transporting passengers and commodities, in the course of commerce between the states, over the territory of New Jersey, and that the tax in question falls on this business in proportion to the number of passengers, and the weight of the commodities transported.

That the state of New Jersey, in the plenitude of her original sovereignty as an independent government, had the right to impose the tax on the business in question, no one can dispute. Did she relinquish such power in the formation of the general government? This inquiry obviously draws into the discussion that provision of the constitution of the United States which declares, that congress shall have power to regulate commerce with foreign nations and among the several states.

The precise question, then, to be considered and decided is, has the tax which has given rise to this controversy been laid within the meaning of the prohibitory clause just referred to, upon commerce between the states?

The principal argument urged before this court, in support of the negative of the foregoing proposition, was that this law did not impose the duty on the goods, but on the business of the plaintiffs in error, and on this account was not within the constitutional prohibition.

It certainly is not to be denied that a state has the right to lay taxes which may incidentally affect commerce between the states. Indeed, it is perhaps impossible to imagine any tax which, in theory at least, may not be said to have, in the

distance, such effect. That this class of taxes is legal, upon both general and constitutional considerations, no one doubts. But the difficulty always has been, and, it is probable ever will be, to determine with precision, when any given tax which has a tendency to affect a subject having immunity, is within the purview of the constitution incidental and when direct. And this is the real difficulty now to be overcome by this court.

The first observation that naturally occurs is that the tax imposed must, to avoid the taint of unconstitutionality, be indirect in substance and not merely so in form. Can it be said that this is so in the present case? This tax falls on inter-state commerce alone. It reaches no further. The burthen is not on a general business, one branch of which is the transportation of extra-territorial goods. On the contrary, the only business of the plaintiffs in error which is not taxed, is the business of such company done entirely in the state of New Jersey, and which does not consist of the transportation of merchandise from state to state. The law discriminates and selects the transportation of commodities passing from state to state, as the peculiar objects of the duty. It is also laid upon an employment in which the citizens of the state imposing it, have no concern; it can, therefore, be increased to any extent without in the least degree affecting their interests. This tax, consequently, cannot be said to fall incidentally on the prohibited subject on account of its being a general burthen on multiform matters, of which the conveyance of articles of traffic, in their passage from one state to another, happened to be one.

But this tax is not only thus specific and restrained to this one class of objects, but it is also graduated by the weight of the things carried. The business is charged a certain sum for the transportation of every ton of goods. The tax, therefore, is regulated, both as to its object and amount, by the articles transported. Now, it is impossible not to perceive that the effect of such a tax must be, so far as respects the owner of such articles, precisely and in all its results the

same as though the commodities themselves were directly taxed. The expense of the conveyance of such commodities from the place of production to the market, is as much an element entering into their salable value, as is the cost of their production. If a distinctive tax were placed upon all persons employed in manufactories, in proportion to the weight or value of the wares manufactured, no one would doubt that such tax would fall upon such wares, and would be, ultimately, paid by the consumer. So when this tax is laid on the transportation of the merchandise, there is no more room for doubt that, by the operation of well known laws, it must pass from the carrier to the things carried, and in the precise ratio of the statutory burthen enhance their price in the market. The consumer must pay the custom, whether it be placed on the goods or upon their transportation. The result, then, is, that this imposition on the business of transportation which, it is argued, is constitutional, produces the same effect, neither more nor less, upon the private business of the owner of the goods, as would be produced by a direct tax on the goods themselves, which latter form of taxation would be undeniably unconstitutional. This substantial identity in the results, would seem to favor strongly an inference of the substantial identity in the causes producing them. The conclusion from this course of reasoning, therefore, is, that if the transportation of merchandise, in transitu from state to state, can be taxed by a state in the form of the law now before this court, the constitutional provision under consideration affords no protection whatever to the owner of the goods which are the subjects of such transportation.

Nor does this matter, if we view it in its political effects, assume a more favorable aspect. The right to place this duty on this business of the plaintiffs in error would be equivalent, considered as a prerogative of state government, to the right to tax the commodities themselves. The political power and the political results would be in both cases identical. The exercise of the right to tax in either of these two

modes would produce the same disorder in the general system of inter-state commerce, and the same antagonism between the governments of the respective states. The origin of the constitutional restriction on the authority of the states, with regard to this species of taxation, is not involved in obscurity. It is known to all that it was the creature of a disastrous experience. The evils which are inseparable from the possession of the power by the several states, to impose burthens on goods passing in the course of trade over their respective territories, had been exhibited, during the existence of the articles of confederation, in results too portentous to be easily forgotten. "The interfering and unneighborly regulations of some states, contrary to the true spirit of the Union," says Mr. Hamilton, in the Federalist, (number XXII.) "have in different instances given just cause of umbrage and complaint to others ; and it is to be feared that examples of this nature, if not restrained by a national control, would be multiplied and extended, till they became not less serious causes of animosity and discord, than injurious impediments to the intercourse between the different parts of the confederacy. The commerce of the German empire is in continual trammels, from the multiplicity of duties which the several princes and states exact upon the merchandises passing through their territories ; by means of which the fine streams and navigable rivers with which Germany is so happily watered, are rendered almost useless. Though the genius of the people of this country might never permit this description to be strictly applicable to us, yet we may reasonably expect, from the gradual conflicts of state regulations, that the citizens of each would at length come to be considered and treated by the others, in no better light than that of foreigners and aliens." Such had been the scene of the past, and such was the anticipated future of this country, as drawn by the hand of a master, if each state were permitted to retain that right which belonged to sovereignty, of prescribing the terms on which the merchandise of other states might pass over her soil. And yet it would seem that all considerate persons

must admit that the power now claimed will occasion, if exercised to any considerable extent, all those effects so much deprecated, and which, in our early career as a people, menaced so seriously the amity and unity of the confederacy. If a state, whose geographical position is upon any of the great harbors along the seaboard, can, by right of its sovereignity, lay burthens on the business of transporting over its territory merchandise on its way to other states, must it not be universally conceded that the restriction in the constitution, now under review, is, considered as a political safeguard, fatally inefficient? It is to be remembered that this law attempts to raise revenue from the business of non-residents. The parties taxed are not the constituents of those who enact the law, and the consequence is they do not possess any of that political influence which, under ordinary circumstances, is the sure means of protection against oppressive legislation. Can any one doubt that an example of this kind of irresponsible taxation will find a host of ready imitators? Or if the example should not be multiplied from imitation, would it not be inevitably reproduced for the purpose of retaliation? Perhaps it is not too much to say, that a tax equal to the one now in question which should be imposed on the transportation of this same merchandise, in each of the states through which it is carried before it reaches our confines, would render the greater part of such merchandise unsalable at the place of its destination, except at a loss to its owner. We cannot suppose that any state would acquiesce in such a condition of affairs; it could not stand by and see its citizens thus despoiled and its commerce in fetters. It would act, and then would ensue that petty conflict of rival interests which, at an epoch in the past already noticed, derogated from the character and endangered the peace of our country.

Nor would the evil consequences of this state prerogative which is now claimed, stop even here. Thus far it has been seen, that its effect would be to disturb the constitutional equilibrium of the states. But it would do more than this; it would affect in a very material point the relation of the

states to the central government. By the fifth clause of the ninth section of article first of the constitution of the United States, it is provided, that "no tax or duty shall be laid on articles exported from any state." This is a restriction on the power of the general government, and its obvious purpose was to guard against the application of the taxing power for the regulation of commerce in favor of one state, to the injury of the interests of another. None will deny that this cautionary provision is vastly important to each several state of this Union. But if the doctrine that the taxation of the business of transportation is not, in legal effect, equivalent to the taxation of the merchandise so transported, is to prevail, what will be the worth of this circumscription of the federal authority? The general government has the same right as that possessed by each state, to tax the business or occupations of individuals, and can, therefore, burthen with tax, concurrently with the local governments, the employment of transportation. It would follow then as an inevitable consequence, that if the law in question is sustainable, so would be a law of congress placing a tax on the business of transporting through Pennsylvania all merchandise passing as exports through that state from New Jersey or elsewhere; and it needs no argument to demonstrate that a tax of this nature could be imposed in such form, and under such conditions as to prevent anything like profitable exportation. Would any state thus disabled be satisfied with the argument, that the tax was not upon the export, but was upon the business of transporting such export? It is believed that such a burthen laid on the commerce of a state would be universally censured, not only as an act of injustice, but as a palpable infringement of the constitutional provision just quoted; and yet, the imposition of such a burthen would appear to be justified by the principle which alone can sustain the state law now in controversy.

The result of this reasoning is, that a recognition of the power claimed, would not only affect disastrously the harmonious intercourse of the states with each other, but would

also subject each of the several states to the liability of the exercise of a highly dangerous power, on the part of the general government.

A construction which would thus frustrate the operation of the federal constitution in two respects, each of which is of great political importance, could not, in my opinion, be justified, except upon the ground that the language of the instrument is so clear upon the subject, that it manifests that these results, so obvious and so hurtful, did not fall within the contemplation of the framers of the constitution, and consequently were not provided against. When an opposite result would be so injurious, it is a relief to conclude that such clear language, evincive of such oversight, does not exist. Interpreting the words of the constitution in the light of the evident purpose of those who employed them, it does not seem to me that the point in question is left in any obscurity. The object was to pass articles of traffic from one point in this country to another, through intervening states, free of impost or duty by such states. The goods, the transportation of which is taxed under the present law, are such articles; nor has it been denied that such goods, while being thus transported, constitute a part of the commerce between the states. But it seems to have been overlooked, that the transportation is as much a part of such commerce as the goods themselves are. If there can be no commerce between the states without goods, so there can be none without the transportation of the goods. The two must be united to constitute interstate commerce. Is it not certain then that a duty on one of these two elements in commerce must, in the nature of things, operate as a tax upon the other? As commerce, the two things are indissoluble; are they divisible for the purpose of taxation? I think it may be laid down as a general rule, universally applicable to all cases arising under the clause of the constitution now considered, that whenever the taxation of a commodity would amount to a regulation of commerce, so will the taxation of an inseparable incident or a necessary concomitant of such commodity. The object being to protect

the merchandise from all exactions in its transit over a state, by a rule of construction as necessary as it is elementary, we must imply a protection to the means requisite to effect such passage; because without such implication, the privilege intended to be secured is defeated.

It was upon this doctrine that the case of *Brown* v. *Maryland*, 12 *Wheat.* 419, was decided. The facts were these. A state law required an importer to pay for and take out a license, as a prerequisite to a right to sell imported goods— and the court ruled that this requisition was in conflict with the provision of the constitution of the United States which prohibits a state from laying any impost or duty on exports or imports. The argument in support of the law was, that the tax was not on the articles imported, but that it was a tax on the privilege of the owner to sell the article after importation. It was said the state might lawfully tax occupations, and that this law did nothing more. But Chief Justice Marshall refuted the argument in the following clear and emphatic sentences: "It is impossible," he says, "to conceal from ourselves, that this is varying the form without varying the substance. It is treating a prohibition which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive that a tax on the sale of an imported article, imported only for sale, is a tax on the article itself. It is true that a state may tax occupations generally, but this tax must be paid by those who employ the individual, or it is a tax on his business. The lawyer, the physician, or the mechanic must either charge more on the article in which he deals, or the thing itself is taxed through his person. This the state has a right to do, because no constitutional prohibition extends to it. So a tax on the occupation of the importer is, in like manner, a tax on importation. It must add to the price of the article, and be paid by the consumer or by the importer himself, in like manner as a direct duty on the article itself would be. This the state has not a right to do, because it is prohibited by the constitution."

This reasoning, the strength and justice of which it is

impossible to resist, appears to be entirely applicable to the case now before this court, for, surely, not more essential is the power to sell the imported article than is the power to transport the article to its market. In the reported case the court also held that the tax upon the sale of the imported article, was likewise repugnant to the clause of the constitution which empowers congress to regulate commerce among the several states, the argument being that commerce is intercourse; that importation and the right to sell the thing so imported were each an essential ingredient of such intercourse, and that consequently a restriction on the power to sell was, in the nature of things, a regulation of commerce.

The case of *Almy* v. *The People of California*, 24 *How.* 169, rests upon analogous principles. The question was whether a stamp duty on bills of lading for gold or silver, transported to any part or place out of the state, was a tax on exports. The court held the affirmative, and declared the act unconstitutional. Chief Justice Taney, in delivering the opinion of the court, thus expresses his views: " But a tax or duty on a bill of lading, although differing in form from a duty on the article shipped, is in substance, the same thing; for a bill of lading, or some written instrument of the same import, is necessarily always associated with every shipment of articles of commerce from the ports of one country to those of another. The necessities of commerce require it. A bill of lading, therefore, or some equivalent instrument of writing, is invariably associated with every cargo of merchandise exported to a foreign country, and consequently a duty upon that is, in substance and effect, a duty on the article imported."

As a bill of lading is not, in any point of view, as necessary to an export as transportation is to an article of interstate commerce, it would seem self-evident, on the assumption of the correctness of this decision, that the taxation of such transportation must, of necessity, be a regulation of commerce within the prohibitory clause of the constitution. It

is conceived that both these cases, so far as relates to the principle upon which the case now before this court is to be decided, are directly in point—and as adjudications of the court of the last-resort, of course their authority is decisive.

It has been already observed that the tax in hand is specific, that is, it affects but a single interest, *viz.*, the transportation of goods in the course of traffic from one part of the country to the other. This singleness in the object taxed must necessarily, as it would seem, make the tax a regulation of commerce. No other doctrine is practicable—because the right to tax in such form is an acknowledgment of the right to prohibit. Yielding the premises, the conclusion is unavoidable. The amount of the tax cannot affect its legality; if the present duty, which it is presumed the business of the plaintiffs can easily bear, is legal, so also would be a duty under which such business must necessarily languish and die. In other words, the nature of this species of taxation is such that a mere increase of sufficient magnitude of the duty in question, would put an end to the business of inter-state commerce, so far as the same is carried on by foreign corporations, over the soil of this state. Nor is it perceived that there is anything in principle, which would prevent an indefinite extension of such taxation. If the employment of these plaintiffs can be thus trammeled, why not impose the burthen on the entire business of transporting merchandise from other states over the soil of this state? It is not forgotten that it was pressed by counsel on the argument in defence of this law, that, as at present framed, it applies solely to the business of corporations created by the laws of other states. Viewed in a merely practical light, this consideration is not of much weight, for it is evident that almost all the commerce between the states must always be in the hands of corporations of this description, and that, consequently, the power to tax to the point of prohibition, the business of such companies, is, substantially, the power to interdict the entire commerce. But considering the question in a theoretical point of view, it would seem to be clear that a state cannot tax for the purpose of revenue, a foreign corporation, in a mode different in prin-

ciple from that in which she can tax one of her own domestic corporations. It is not denied that the corporate existence of a company is recognized, not by right but of grace, in foreign jurisdictions, nor that each government has the competence to refuse to recognize such existence, except on its own conditions. The principle is universally acknowledged. Hence, laws requiring insurance companies and other foreign corporations to file bonds and submit to other exactions, as a prerequisite to their admission in an incorporated capacity, into the state. Such laws, when rightfully made, are evidently mere police regulations, designed to protect the citizens of the state in which they are enacted from loss or imposition, and on this ground their legality cannot be drawn in question. But a tax law, having revenue for its object, is based upon a principle entirely different. The right to tax for revenue is the right of the government to take so much of the property of the person or company upon whom the tax falls, as such government may deem necessary for its public wants. The act of taking the property, therefore, must of necessity be an acknowledgment of the legal status of the person or company whose property is taken. To assert that the company whose property is thus taken has no rights but such as the government taking it chooses to confer, is to assert that such company has no title to its property but such as may be conceded to it by the taxing power. It seems to be utterly inconsistent with legal principles, which have always been deemed axiomatic, to hold that a government can recognize the legal existence of a foreign corporation for the purpose of taxation, and at the same time can deny such legal existence for the purpose of depriving it of those rights which belong to every individual or company known to the law. Such a doctrine would, obviously, offer the entire property of foreign corporations as a prize to the rapacity of any state in whose territories it might be, or over which it might happen to be carried. It is readily to be admitted that a law imposing certain terms upon all foreign corporations as conditions precedent to their acquisition in this state, of the

right to act in the unity of their corporate existence, would be legal. Such law would prevent foreign persons from doing any legal act in this state as a corporation, but can it be maintained that such law would have the further effect of leaving the property of the company as the spoil of the first taker?    A statute that should abolish the rule of comity, and should refuse a recognition of foreign corporations, would, it is conceived, have this effect and no more, i. e., to convert the foreign corporators, as to the state enacting the supposed law, into a partnership of individuals; and thus, although the corporation, as such could not, by suit or otherwise, assert its right to protect its property, the members of the company would be under no such disability.    The opposite view would place the larger part of the property of corporations, in whose possession is accumulated so much of the wealth of the country, out of the protection of those fundamental principles of law, without the safeguard of which, all property loses so much of its value.    If a state under a tax law can require a foreign corporation to pay any sum it may please, and then may defend itself against the alleged unconstitutionality of such act on the plea, that the company taxed has no rights, but such as of grace may be conferred upon it, no reason is perceived why the general government could not at its pleasure seize the property of all corporations in this country, on the ground that incorporated companies have no rights which the law is bound to respect, or which are recognized by the constitution of the United States.    A principle involving such results is not admissible.    The clause of the tax act in question, in my view, cannot be defended on the fact that the parties taxed are foreign corporations.    The result therefore is, that if the present statute can be sustained, a law taxing the entire business of transporting interstate commerce would be constitutional—the inevitable corollary to that proposition being, that as the power to tax transportation includes the power to destroy it, each state holds the right to permit or to refuse passage over its soil of goods carried in the course of trade from state to state.    The

statement of the proposition leaves my mind free from all doubt that the exercise by a state of a prerogative of this character, either so far as to burthen such transportation or to prevent it altogether, is a regulation of commerce which falls under the prohibition of the constitution of the United States.

Upon the argument before this court, it was rather suggested than insisted on, that the authority conferred by the constitution upon congress to regulate commerce among the several states, is not exclusive, but is concurrent with that of the states. The court, in illustration, were referred to the laws passed by the several states for the regulation of pilots and pilotage, and others of a like character, the constitutionality of which is not now at all questionable. But it is believed that since the decision of the case of *Cooley* v. *Board of Wardens of Port of Philadelphia*, 12 *How*. 299, this question, so far as it relates to a case similar to the one now before this court, is not open to discussion. Formerly, it must be confessed, the matter was perplexed to a great degree, by much contrariety of opinion among the several members of the Supreme Court of the United States, but the decision referred to has placed the doctrine on more stable grounds. In that case it was resolved, that although in matters of mere local interest, such as a system of rules controlling pilotage in harbors, the power of congress was merely concurrent with that of the states; nevertheless, whatever subjects of the power to regulate commerce were in their nature national, or admitted of only one uniform plan of regulation, were of such a character as to require exclusive legislation by congress. It is plain that this could not be affirmed of laws for the regulation of pilots and pilotage—but is it not equally plain that it can be affirmed of the regulation now in question before this court? If the foregoing argument has been successful, it has established the proposition that the tax created by the law of this state, is a taxation of inter-state commerce, and, certainly, admitting that postulate, all must concede that it is in its nature national, and not local.

The result, then, to which my examination of this subject

has led me is, that the legislature of this tsate had not the constitutional power to lay the tax in question on the business of the plaintiffs in error.

This conclusion has not been reached without the exercise of that degree of reflection which the importance of the subject so eminently demanded. Not the slightest doubt has been entertained that the law under review was enacted with the fairest intention, and that its purpose was simply to subject foreign corporations doing business in this state to an equitable share of the business of maintaining that government, which extended its protection to them as well as over the business of its own citizens. Nor has it been forgotten that it was one of the attributes of sovereignty, the taxing power of the state, which was to be passed upon. It is conceded that this prerogative is not only imperial in its character, but is absolutely necessary to the public welfare, and that a right, at once so elevated and so essential, is not to be diminished or impaired in the slightest degree, even on constitutional considerations, except on the surest grounds. But it is also to be remembered, that even more valuable than the revenues of a state, are those fundamental restrictions which prevent each member of this confederacy from the exercise of those powers which, in the grand scheme of our national polity, have been prohibited. And being entirely satisfied, from the reasons above stated, that the legislative act now before this court, in imposing the tax in controversy, infringes one of those restrictions, it seems to me, that, so far as its operation in this particular is concerned, it should, without hesitation, be declared by this court to be void.

In my opinion the judgment of the Supreme Court should be reversed.

*For reversal*—BEASLEY, C. J., CLEMENT, CORNELISON, ELMER, GREEN, CH., KENNEDY, OGDEN, WALES.    8.

*For affirmance*—NONE.

CITED in *State* v. *Corrigan, Collector,* 10 *Vroom* 37; *State* v. *Engle, Receiver,* 5 *Vroom* 4.